IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 7, 2006

**CHICO McCRACKEN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. P-27798   James C. Beasley, Jr., Judge**

───────────────

**No. W2005-01999-CCA-R3-PC  - Filed February 20, 2007**

───────────────

The Petitioner, Chico McCracken, was convicted of one count of murder in the perpetration of a felony and one count of aggravated robbery.  He petitioned for post-conviction relief claiming that he had received the ineffective assistance of counsel at trial.  The post-conviction court dismissed the post-conviction petition, and we affirm that judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Eric Christensen, Memphis, Tennessee, for the appellant, Chico McCracken.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Facts**

This appeal arises from an order denying the post-conviction petition by the criminal court. The Petitioner was originally convicted of murder in the perpetration of a felony and aggravated robbery.  Those convictions were affirmed by this Court.  State v. Chico McCracken, No. W2001-03176-CCA-R3-CD, 2003 WL 1618082 (Tenn. Crim. App., at Jackson, Mar. 24, 2003), *perm. app. denied* (Tenn. Sept. 2, 2003).  The facts of the case were stated there as follows:

In the early morning hours of December 1, 1999, Defendant and William Wilson, his half-brother, arrived at the Ebony and Lace Nightclub in Memphis, Tennessee.  Mr.

Wilson entered the club, while Defendant walked around to the side of the building where a game of dice was underway. Soon, the victim of the aggravated robbery, Hubert Benson, arrived at the club and eventually joined in the game among Defendant and three of the club's employees. Mr. Benson had seen Defendant at least once before at the nightclub, but he was not personally acquainted with Defendant.

During one of Mr. Benson's throws, one of the dice bounced off the hand of one of the players. An argument broke out between Defendant and Mr. Benson as to whether the throw was valid. As soon as Defendant and Mr. Benson exchanged words, the other players walked toward the club's entrance leaving Defendant and Mr. Benson alone. Two patrons of the nightclub alerted Mr. Wilson that his brother was involved in an altercation and when Mr. Wilson approached the two men, Defendant told him to go get the car.

After Mr. Wilson left, Defendant drew a gun out of his front pocket and demanded that Mr. Benson hand over his money. Mr. Benson refused and Defendant shot once in the air. At that point, Mr. Benson threw between $200 and $300 on the ground, including the $160 he had won that night. Defendant, however, ordered him to empty his pockets. Because it was the first of the month, Mr. Benson was carrying between $1,300 and $1,500 in cash which was earmarked for rent and a car payment. Mr. Benson at first refused to give Defendant any more money, and Defendant fired at the ground between Mr. Benson's legs. Mr. Benson threw the rest of his money on the ground, but Defendant threatened to kill him anyway. At this point, Mr. Wilson drove up. Defendant told Mr. Wilson to get out of the car and pick up the money. As Mr. Wilson gathered up the loose bills, Defendant continued to point his gun at Mr. Benson. When Mr. Wilson was finished, both men got in the car, a blue Mazda, and left the nightclub with Mr. Wilson driving.

Mr. Benson ran first to the nightclub and asked the security guards for help. When they refused to get involved, Mr. Benson followed Defendant and Mr. Wilson in his car. Mr. Benson assumed that the men would travel toward the interstate, and he headed in that direction. In a few minutes, Mr. Benson spotted the blue Mazda. As he tailed Defendant and Mr. Wilson, Mr. Benson called the 911 operator and reported the incident and the direction the trio were heading. Near the interstate, Defendant and Mr. Wilson apparently noticed Mr. Benson's car behind the Mazda. Mr. Wilson turned off the car's headlights and accelerated to around ninety miles per hour, ignoring stop signs and traffic lights.

Meanwhile, Officer John Robinson was following the Mazda's route over his radio as relayed by the dispatcher. When he spotted the cars, Officer Robinson made a u-turn, and joined the pursuit maneuvering the patrol car between the Mazda and Mr. Benson. The road had multiple lanes going north and southbound.

Officer Robert Wilkie caught up with the cars next and moved his vehicle in position directly behind Officer Robinson, with Mr. Benson still following at the end of the line. Officer Wilkie testified that when he joined the chase, Mr. Wilson was driving between fifty-five and sixty miles per hour with the headlights off. All the cars were traveling at the same speed, one or two car lengths apart.

Officers David Royal and John Chevalier had just ended their shift, when they listened to a call from Officer Robinson asking for assistance in stopping a robbery suspect. Officer Robinson reported that he had seen a gun pointed at him through the Mazda's window. Realizing they were less than a mile away from the chase, Officers Royal and Chevalier pursued the cars, with Officer Chevalier driving. When they caught up with the chase, Officer Chevalier pulled in behind Officer Wilkie. At this point, all four cars were in the left lane. The cars maneuvered around a curve, then Officer Robinson pulled into the right lane after the road straightened out in an attempt to pass Mr. Wilson.

Officer Royal said that they too pulled into the right lane after Officer Robinson made his move. Officer Robinson accelerated slightly and was nearly past the Mazda when Mr. Wilson suddenly pulled the car to the right, hitting the left rear of Officer Robinson's car. Until then, Mr. Wilson appeared to be in control of his car, and all three officers testified that Mr. Wilson intentionally jerked the Mazda toward the right lane. After impact with the Mazda, Officer Robinson's car skidded sideways, spun out of control and slid down an embankment on the right side of the road. The Mazda's brake lights flashed, the car hit the guardrail on the edge of the left lane, and then bounced back and stopped in the road. The other officers were able to make a controlled stop.

Officer Wilkie arrested Mr. Wilson while Officer Royal arrested Defendant and neither man attempted to flee. Neither officer saw a gun on Defendant or in the Mazda although Officer Wilkie noticed several pieces of money lying in the seat and in the floorboard. Officer Chevalier ran down the embankment to assist Officer Robinson. The car had bounced off two or three trees before stopping. Officer Robinson was alive, but his breathing was labored. He was transported to the hospital by helicopter. Officer Robinson died later that day as a result of the injuries sustained in the collision.

Angela Williams, the owner of the Mazda, testified that she had asked Defendant to drive her to work on November 30, then take the car into a garage for repairs. For about a week, Ms. Williams said, the car had a tendency to pull to the left and shudder when driven at a certain speed. The garage could not repair the car that day and asked Ms. Williams to leave it overnight. However, she needed the car to run errands that evening so Ms. Williams retrieved the car temporarily, leaving the keys

under the car's floor mat when she returned the Mazda to the garage later that night. When she returned home, Ms. Williams called Defendant and asked him to bring some milk for her baby, and Defendant knew her car was still at the garage. Defendant never showed up at Ms. Williams' apartment that night.

Wardell Askew, an employee of Ebony and Lace, was a member of the dice game that precipitated the argument between Defendant and Mr. Benson. At trial, Mr. Askew confirmed that Defendant began arguing after Mr. Benson's dice hit a bystander, but he walked away from the game before Defendant drew a gun. Mr. Askew got as far as the club's entrance door when he heard a gunshot followed by a second shot. He sent someone into the club to page Mr. Wilson, but two men had already found Mr. Wilson and sent him outside to see what was going on. Mr. Askew remained approximately fifty feet away from Defendant and Mr. Benson. Although he watched Mr. Wilson pick up the money on the ground, Mr. Askew never saw a gun and did not know who fired the shots.

When Defendant was arrested, the officers did not find a gun on either Defendant or Mr. Wilson. However, they recovered approximately $1,700 from the Mazda's floorboard and front seat. Defendant also had a pair of dice in his pocket. Officer Dana Stine accompanied Mr. Benson back to the nightclub where Officer Stine retrieved three .380 caliber cartridges and two "AK-47 cartridges." The next morning, police officers walked along the road from the collision site to the point where Officer Robinson joined the chase but were unsuccessful in locating a gun.

Robin Beach, a member of the Michigan State Police and an accident reconstructionist, examined the collision site aided by members of the Memphis Police Department. His examination revealed a circular rubber transfer from the Mazda's right front tire onto the left rear corner of Officer Robinson's car. The Mazda's right front tire was abraded, and a tear in the tire's covering correlated to the metal sticking through the left rear panel of the police car. White paint from Officer Robinson's car was also present on the Mazda's right front fender. Sergeant Beach testified that the circular patterned rubber transfer on the left rear panel of the police car could only be caused by turning the wheel to the right, thereby exposing the tire's tread. If the tire had been straight on impact, Sergeant Beach explained, there would be no rubber transfer. Based on the limited amount of rubber transferred, however, Sergeant Beach estimated that the two cars were only in actual contact for a matter of seconds before Officer Robinson's car spun out of control.

Sergeant Beach also noted that the absence of an alteration in the filaments in the Mazda's headlights indicated that the lights were not on at the time of impact. The tires on both vehicles were in good shape. Sergeant Beach stated that the two cars were traveling at the same speed of approximately forty-nine miles per hour.

-4-

The Petitioner filed a pro se petition for post-conviction relief after his conviction, which was amended by appointed counsel. A hearing was held in July 2005 on the Petitioner's claim of ineffective assistance of counsel, and the following evidence was presented: the Petitioner, Chico McCracken, testified that he only spoke with his original trial counsel ("Counsel") two times during the course of the representation. The second time they met, Counsel brought him a discovery packet, which he examined by himself. The Petitioner additionally expressed a desire to have an investigator, but Counsel advised him that was not possible because the investigator had a tumor in his head. The Petitioner stated he was not given the opportunity to provide Counsel with any more information or discuss the case with her until the day he was to be tried.

The Petitioner further testified that he told Counsel he wanted the investigator because there were witnesses who could testify for him. Those witnesses were Tomeka Wallace, Sleeve, Big Junior, and Mook. The Petitioner stated that Big Junior actually came to the Petitioner's trial but he was not allowed to testify because he had not been subpoenaed. The Petitioner told Counsel about these witnesses the day of trial, and had these witnesses been subpoenaed to testify, they would have stated that one of the victims, Herbert Benson, was not robbed, the Petitioner never had a gun, and that the Petitioner had money with him. Additionally, the Petitioner wanted the first officer on the scene called to testify because that officer took and kept the money which was on the Petitioner.

The Petitioner also testified that he believed the five shell casings, three .380 and two AK-47, should not have been introduced into evidence, and Counsel should have prevented that. Counsel did not question witnesses in relation to the shell casings or concerning a ballistics test done on the Petitioner. Additionally, no questions were asked of the witnesses concerning the lack of a gun being found. The Petitioner also voiced his concerns about the significant amount of publicity associated with a similar case tried thirty days before his and the fact that no motion for a change of venue was ever filed. Additionally, no traffic investigators or reconstructionists were hired on behalf of the Petitioner.

On cross-examination, the Petitioner testified that he never really discussed his case with Counsel. On the day of trial, he was able to give Counsel the names of his four witnesses, but he did not know the real names of Sleeve or Mook, and the Petitioner did not have any address for Sleeve, Mook, or Tomeka Wallace. The Petitioner stated he had $4700 in dirty money on him, but $1700 of clean money was entered into evidence. The $4700 was taken by the arresting officer. Had this information come out at trial, it would have proved that he did not rob Benson because Benson had $1700 taken from him. Addressing the shell casings, he stated that, although he never specifically requested that Counsel file a motion to suppress the bullet shells, it would have benefitted him by showing the shells were not his. The Petitioner did request Counsel file a motion to change venue during trial.

On re-direct examination, the Petitioner stated that he did give Counsel a point of reference for Sleeve, Mook, and Tomeka Wallace. They were all associated with the club, and had an investigator gone there, the trio could have been found.

-5-

Counsel testified she met the Petitioner on September 25, 2000, they examined discovery, discussed the facts of the case, and discussed possible witnesses. The Petitioner told Counsel that Wardell Askew could put her in contact with the potential witnesses. The Petitioner gave Counsel someone's phone number and said to leave a message. That person would get in touch with Askew, who would call Counsel back. This was done but Askew never returned the calls. Askew ended up being called as a witness for the State, and Counsel talked with him on the day of trial. At that point, Askew said he did not know any of the people who were outside at the time of the robbery.

Counsel testified that she definitely met with the Petitioner on January 5, 2001, February 9, 2001, February 23, 2001, April 27, 2001, and April 30, 2001. Counsel was never able to locate Sleeve or Mook because the street names were all the information the Petitioner was able to provide. Counsel stated that the Petitioner never mentioned Tomeka Wallace or Big Junior. Counsel additionally had no recollection of the Petitioner ever telling her that Big Junior was there to testify.

Counsel specifically did not file a motion to suppress because she felt the spent shell casings helped the Petitioner. There was no gun found, and the number of bullets did not match up with the number of alleged shots. It was part of Counsel's trial strategy to show there was no robbery. There was never anything which could have been analyzed for fingerprints. Counsel never felt, after the jury questionnaires and voir dire, that the Petitioner would not get a fair trial, and, as such, there was no legal basis for a motion to change venue. Counsel did not get an accident reconstructionist because she felt that was not the important issue: the important issue was whether or not there was a robbery. Counsel did not recall ever being told that the arresting officer took the Petitioner's money.

On cross-examination, Counsel testified that it was her strategic decision not to call an accident reconstructionist because she felt it would not have mattered. The officer died and it would have made no difference exactly how the officer's car came to be run off the road. Additionally, Counsel weighed the pros and cons of having the Petitioner testify as to exactly how the accident occurred, but the Petitioner's prior robberies could have been used against him. Counsel felt she properly questioned the jurors concerning the publicity surrounding a similar case and felt there was no reason for a change of venue motion: all the jurors could distinguish between the two cases. Counsel stated that she did talk with her investigator, Ms. Abbott, and they went to Ebony and Lace. However, Abbott simply could not locate the witnesses with only street names. Counsel also testified that she did not question the officers because she felt they had not testified to anything which hurt the Petitioner and she did not want them to get the opportunity to do so.

The post-conviction court determined that Counsel adequately pursued her motion to sever and there was no basis for a motion to change venue. Additionally, based on the defense strategy that there was no robbery, there was nothing an accident reconstructionist could have provided that would have helped the Petitioner. Additionally, the Petitioner did not show prejudice because there was no reconstructionist to tell what he would have testified to at trial. Additionally, the court stated it did not know of a valid motion to exclude the spent shell casings. Even if the shells could have

been excluded, it was the trial strategy of the defense to claim the three .380 casings show an inconsistency in the claim there were two shots fired. The court also discredited the testimony of the Petitioner that he only met with Counsel two occasions. The Petitioner did not produce these witnesses he claimed would have benefitted him, and Askew, the man who could allegedly put Counsel in touch with the witnesses, denied knowing them. Counsel performed adequately and properly in the course of her representation of the Petitioner. As a result, the court denied the petition for post-conviction relief.

## II. Analysis

On appeal, the Petitioner claims that the trial court erred when it dismissed his petition for post-conviction relief because he was denied the effective assistance of counsel. He asserts that counsel was ineffective in failing present a defense by not calling a single witness on his behalf; Counsel failed to cross-examine certain witnesses; Counsel failed to file a motion to suppress the spent shell casings; and Counsel failed to file a motion to change venue.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103 (2003). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999); Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. State v. White, 114 S.W.3d 469, 475 (Tenn. 2003); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes

both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984); see also State v. Melson, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Strickland, 466 U.S. at 688 (1984)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Finally, we note that a petitioner in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. House, 44 S.W.3d at 515 (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. House, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

The Petitioner has argued a number of instances of deficient performance which, he alleges, resulted in prejudice to his case. First, we examine the claim that Counsel did not present a defense by not calling any witnesses on behalf of the Petitioner and not cross-examining the officers. Counsel testified she was told of Sleeve and Mook, and attempted to locate them. She called the phone number which the Petitioner directed her to, and she and an investigator went to Ebony and Lace to attempt to locate witnesses. However, because the Petitioner did not know their real names or addresses, locating these two witnesses proved to be impossible. Counsel additionally asked Askew, the man to whom she was directed, about the location of these witnesses when he testified at trial. Askew told Counsel he did not know who these people were or where to find them. Counsel also stated she was never told about Tomeka Wallace or that Big Junior was at court to testify for the Petitioner. The Petitioner's defense consisted of discrediting the theory that there was a robbery, and the Petitioner told Counsel of no other witnesses who could testify there was no robbery. As the post-conviction court found, there was no need to bring in an accident reconstructionist because the issue of precisely how the officer came to be run off the road was of little importance.

Counsel also stated she did not cross-examine the officers because they had not said anything damaging to the Petitioner, and she did not want to give them the opportunity to do so. Considering Counsel's strategy of disproving the robbery, there is little the officers could have been cross-examined on concerning that subject. The physical evidence was present, and Counsel determined that the best strategy would be to argue at closing that the victim was not to be believed because the physical evidence did not corroborate his story. If the jury determined there was no robbery, there would be no murder in the perpetration of a robbery. We agree with the post-conviction court that the Petitioner has not shown that Counsel was deficient in not calling the Petitioner's witnesses or cross-examining the officers.

Second, the Petitioner claims Counsel was deficient in failing to file a motion to suppress the spend shell casings which were admitted into evidence. There were two AK-47 shell casings and three .380 casings which were found at the scene and admitted into evidence. The defense theory was that, because there was testimony that the Petitioner had a pistol and fired two shots, the shell casings actually helped the defense. The two AK-47 casings clearly could not have come from a pistol, and the three .380 casings were inconsistent with the claim of two shots fired. The physical evidence was clearly inconsistent with the testimony, and we will not second guess Counsel's strategy to not object to that evidence. We also note that the post-conviction court stated it had not heard any basis for not admitting the casings into evidence, so, additionally, the Petitioner could not prove prejudice. We agree. Counsel was not deficient in her strategic choice to not object to the shell casings.

Finally, the Petitioner claims Counsel was deficient in not making a motion for a change of venue because the Petitioner's case came one month after another well publicized case with similar facts, the Overton Case. Counsel testified to the lengths she went in determining whether the jury pool had been tainted by the publicity surrounding the Overton Case. Counsel had the jury fill out a questionnaire prior to voir dire and made a motion, which was denied, to have the jury individually voir dired. Counsel also testified that she did not believe that there was a basis for making a motion

to change venue because the jury seemed oblivious to the publicity. The post-conviction court agreed with this statement, saying it was never surprised at how little potential jurors in Shelby County know. We agree with the post-conviction court that the Petitioner failed to prove Counsel was deficient in this instance.

Counsel's actions fell within the "wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Because the Petitioner has not shown by clear and convincing evidence that his trial counsel was deficient and that he was prejudiced by that deficiency, he is not entitled to post-conviction relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE